Pierre Gr. Ltjkdberg, J.
The saga of Williyan Thasa will evoke little sympathy; little attention will be paid to it by those who should. Our affluent society will continue to give inadequate attention, which includes insufficient monetary appropriations, to the affairs, problems and supervision of the mentally ill.
While this is essentially a hearing to suppress a confession by Thasa to a murder and other physical evidence, its ramifications are far deeper.
On January 20, 1970, Marie Brienza, a patient at the Suffolk Psychiatric Hospital was apparently murdered. Her body was discovered on January 21, 1970. After a preliminary investigation, two officers of the Suffolk County Police Department on January 22, 1970, took Thasa from a closed ward of the *1066 Central Islip State Hospital, a hospital under the jurisdiction of the Department of Mental Hygiene.
Thasa was taken to the office of the Homicide Squad for questioning. Promptly on his arrival and before any questioning, he was arrested for the Brienza murder and dutifully advised of his Mircmda rights, all of which he ostensibly waived before proceeding to give an oral and written confession to the crime.
Following the signing of his written confession, police officers took him to the area where the body had been found and Thasa located for them the top to a bottle of “ Twister ” wine allegedly used by him in committing the crime and took the officers to the liquor store where he had purchased it as well as the abandoned building where he and the deceased had allegedly had voluntary sexual intercourse. (The motive for the crime, as stated in the confession, was that on the return to the grounds of the hospital, the decedent declared it would be necessary^for her to tell her doctor and her husband about the act of intercourse.)
The defendant seeks to suppress his seizure by the police and everything that flowed therefrom. The police assert that they lawfully took Thasa, for questioning only, with the consent of the hospital authorities.
Detective Stahl originally testified on April 14, 1971, that permission had been received from Dr. Kernitsky, the physician in charge of ward S-2. After Kernitsky testified- on April 20, 1971, that he gave no one permission 'and learned of their taking Thasa after he was gone, Stahl was recalled on May 3, 1971, and testified that he was mistaken as to Kernitsky but now recalled that his partner, George Harrison, had obtained permission from Deputy Director Irving Jacobs. Harrison testified that he had talked to Jacobs and Jacobs was only concerned that Thasa be returned after the questioning if no charges were made and thereafter made a telephone call to someone. Harrison further testified that, as a closed ward, S-2 was locked ,and it was necessary to get assistance from hospital personnel to get in and out. Jacobs testified he did not recall the incident at all and that he would have authorized a release only if the Director was not on duty but that the Director was on duty on January 22. The Director testified that he was on duty, but has no recollection of anything concerning Thasa and that since he was on duty he would have been the one to make the decision.
The Director asserted that under section 87 of the Mental Hygiene Law he has the absolute power to release a patient to the police. He 'and Dr. Jacobs further testified that except for a court order no one could be released to the police, per *1067 warrant of arrest or otherwise, without the Director or Deputy Director’s consent and that if in their respective judgment when acting after a review of the patient’s file and consultation with the physician in charge of the ward the patient’s physical and mental health would be endangered they would not give such consent. (The Director indicated he would be more concerned with the physical condition of a patient and if that was satisfactory would not hesitate to release a patient to the police.) Neither the Director nor his deputy recalled ever seeing the Thasa file in January, 1970.
Thus far, aside from a classic example of passing the buck, there is little remarkable about this ease and I am satisfied that the police officers obtained the permission of someone in ostensible authority at the hospital before removing Thasa.
I find that prior to his release to the police officers, no one in authority consulted the ward physician nor did anyone review Thasa’s rather remarkable record wherein one can read, among other things, as follows:
Thasa was born Jack W. Douglas in New York City. His parents were also born in the United States. (His statement given to the police states he was born in Africa.) He married and his listed occupation is an entertainer — singing and playing a guitar together with his wife.
On April 20, 1966, defendant was admitted as a voluntary patient at Central Islip State Hospital from Bellevue Hospital ; his, then, diagnosis was ‘1 Without Mental Disorder: Chronic Alcoholism ”. He was discharged to his own custody on May 12, 1966.
Again via Bellevue Hospital he was admitted to Pilgrim State Hospital on July 25, 1967, as a voluntary application. As of August 31, 1967, a diagnosis was made of “ Psychosis due to Alcohol, Chronic Alcoholism ’ ’. Released to convalescent care on September 7,1967, 'he was discharged April 5, 1968.
His third admission was again to Central Islip on September 27, 1968, by which time his diagnosis was “ Schizophrenia: Chronic Undifferentiated Type ”. The Director applied for a court order of retention on November 27, 1968, stating inter alia: “ Patient has a history of assaultive behavior prior to admission. He shows evident thought disorder, is suspicious and guarded. ’ ’ An order of retention was signed in the Supreme Court, Suffolk County, on January 6, 1969. Defendant escaped February 11, 1969. Because of his assaultive record the hospital placed him on ‘ ‘ escape status ’ ’, his wife and law enforcement officials were notified. While in escape status and promptly on the expiration date of the order of retention, July 6, 1969, *1068 defendant was discharged with the above-mentioned diagnosis.
Seemingly undeterred by his administrative discharge, Thasa achieved his fourth admission as a voluntary patient via Bellevue again, to Central Islip on September 25, 1969. While the diagnosis was ‘ ‘ Schizophrenia, Chronic Undifferentiated Type ’ ’ no attempt was made to secure any order of retention. Defendant left the hospital without consent on November 30, 1969. Again because of his past criminal record he was placed on escape status and notice to his wife and the proper authorities given.
Our bureaucracy functioned at its best — on December 1 the G-rammercy Welfare Center telephoned the hospital to advise defendant was there applying for welfare. The hospital physician in turn, advised he had left illegally and should be sent back and also spoke to defendant and told him to return. A second call from Grammercy advised the hospital that the welfare center had given him money to return and this patient with a long standing history of alcoholism had said he would.
Probably despairing of seeing Thasa again, the hospital, on December 12, 1969, recorded him 1 ‘ Discharged ’ ’ as 11 Improved ”. Undaunted Thasa was back for his fifth admission, via Bellevue, on December 24,1969, with the same diagnosis of “ Schizophrenia, Chronic Undifferentiated Type ”. This time he remained until his custody was obtained by the police on January 22, 1970; the hospital having been advised that Thasa was charged with the slaying, he was recorded as ‘ ‘ discharged to the custody of the police ’
Arraigned on a charge of murder on January 27, 1970, an order was thereafter made on February 26, 1970, for an examination pursuant to section 658 of the Code of Criminal Procedure. On March 11, 1970, the examining psychiatrists diagnosed him as schizophrenia, paranoid type. 1 ‘ He was found to be lacking in insight and his judgment is defective ”. The report concluded that defendant was incapable of standing trial. Transferred to Matteawan State Hospital, defendant was determined by that institution capable of standing trial on July 16, 1970, with this included in the report: “ After his admission to Matteawan State Hospital, patient continued to show symptoms of mental illness and expressed many paranoid delusions.”
To me it is absolutely shocking that there is seemingly so little effort made to control the activities of a person like the defendant. The court order of retention is virtually a nullity once the patient escapes, at least, as interpreted by the Department of Mental Hygiene. Query, how many assaultive crimes *1069 may have been committed while defendant enjoyed escape status ?
Too many people appear before this court with histories of mental illness for us to be complacent. Their victims are rarely fellow inmates. We have proceeded forward from the days of the alms house but our limited expenditure of public funds in this area is a false economy. The adequacy of the facilities, the personnel and the available treatment cannot withstand the libertarians ’ arguments for freedom of the individual; yet, by freeing these individuals without cure, other individuals are the ones who suffer.
Since no one will pay heed to my cries, I have written enough and shall turn to the resolution of the suppression motion.
While defendant’s argument is pegged to an illegal seizure of his person (cf., Morales v. New York, 396 U. S. 102), it seems to me the issue can more easily be resolved on the issue of defendant’s mental competence to understand the Miranda warnings and to have intelligently waived those rights.
The memorandum of law of the People states among other things: ‘ ‘ Nowhere in the record is there any explicit indication that the defendant could not ‘ voluntarily ’ make a statement or waive his constitutional rights within the meaning of the applicable case law.” Literally, this may be true insofar as the hospital record, alone, is concerned; but when the hospital record is coupled with the March 11, 1970, report of the examining psychiatrists and the Matteawan report of July 16, 1970, the presumption of sanity and capability has been overcome. An order of this court, dated March 23,1970, judicially determined defendant to be incapable of ‘ ‘ understanding the charge, indictment or proceedings against him or of making his defense ”. How could this person who was found to be “ lacking in insight and his judgment is defective ” have been capable of understanding his constitutionally protected rights as enunciated by Miranda and further to have waived them?
The essential constitutional right was that he did not have to tell the police anything. This differs from his being able to tell the police what occurred. The entire record refutes defendant’s ability on January 22,1970, to understand and intelligently waive that essential constitutional right (see and cf., People v. Frampton, 31 A D 2d 551 ; People v. Bangert, 22 N Y 2d 799 ; People v. Boundy, 10 N Y 2d 518). I find that the People have failed to prove voluntariness beyond a reasonable doubt. On this finding the oral and written statements, the tour of the crime scene, the broken bottle and all that flowed from the initial interrogation at police headquarters must be suppressed.
*1070 I would, likewise,' suppress everything as above stated on the ground that while the police acted in good faith, they had no right to defendant’s custody on January 22, 1970.
Despite the Director’s interpretation of section 87 of the Mental Hygiene Law, the record is barren of any compliance with the section; i.e., neither the Director nor his deputy concluded on January 22, 1970, that Thasa was: (1) recovered, (2) not mentally ill, (3) a patient whose discharge would not be deterimental to the public or injurious to the patient (Quaere, is ‘ ‘ injurious ’ ’ only physical or does it include legal). Lastly, no evidence was submitted that the required written certificate was filed with the Department of Mental Hygiene. Presumably absent compliance with said section 87, jurisdiction over the custody of the patient rested with this court or the Supreme Court (Mental Hygiene Law, § 100) and there is no evidence that either court ceded custody to the police.
Thasa was a ward of the State, albeit one who apparently came and went as he pleased, and the duties imposed upon one agency of the State by Miranda cannot be ignored by another. As a ward of the State, it was the duty of either the Director or the court to have provided Thasa with counsel before permitting him to be questioned.